1    **WO**

2

3

4

5    **IN THE UNITED STATES DISTRICT COURT**

6    **FOR THE DISTRICT OF ARIZONA**

7

8    Erin Krestan,                                    )    No. CV-08-194-PHX-DGC
                                                       )
9              Plaintiff,                              )    **ORDER**
                                                       )
10   vs.                                               )
                                                       )
11   Deer Valley Unified School District No.)
     97, of Maricopa County; et al.,                   )
12                                                     )
               Defendants.                             )
13                                                     )
     _____)

14

15

16          This case concerns the right of a student religious club to disseminate information

17   about the club's activities, including a weekly morning prayer event, through a public high

18   school's public address system and through the distribution of leaflets on the high school's

19   campus.  Plaintiff Erin Krestan asserts that her rights under the Equal Access Act and the

20   First Amendment to the United States Constitution have been violated.  Plaintiff seeks a

21   preliminary injunction requiring Defendants to permit dissemination of her club's

22   advertisements.  For the reasons set forth below, the Court will grant in part and deny in part

23   the request for preliminary injunctive relief.[1]

24   _____

25          [1] Because Plaintiff was not 18 years old when this action was initially filed, the
     original caption of the case identified the plaintiff as "E.K., a minor by and through her next
26   friend, L.K."  Dkt. #7.  After E.K. had turned 18 and Defendants had challenged the ability
     of L.K. to continue representing her in this case (Dkt. #24), the Court granted leave to amend
27   the complaint to name E.K. as the sole plaintiff in this action (Dkt. #28).  Plaintiff Erin
     Krestan subsequently filed an amended complaint.  Dkt. #32.
28

1    **I.    Factual Background.**

2         The parties have submitted a verified complaint, several affidavits, and a number of

3    exhibits in connection with the preliminary injunction briefing.  In addition, counsel for

4    Defendants proffered a number of additional facts at the preliminary injunction hearing held

5    on April 17, 2008.  The factual description that follows is based on the written materials

6    submitted by the parties and defense proffers to which Plaintiff did not object.[2]

7         **A.    Plaintiff.**

8         Plaintiff Erin Krestan is a resident of Glendale, Arizona, and a student at Mountain

9    Ridge High School ("MRHS"). Dkt. #7, ¶ 22.  Krestan is a professing Christian and belongs

10   to Common Cause, a student club organized at MRHS.  Common Cause consists of Christian

11   students who meet together to worship, pray, sing, and enjoy fellowship.  *Id*. ¶ 26.

12   According to Plaintiff's description, Common Cause meetings include discussions of "faith

13   and religion; current political and social topics; homosexual behavior; assisting

14   disadvantaged peers at MRHS; service to others; leadership; promoting respect and dignity

15   toward others; and underage drinking."  *Id*. ¶ 27.  Krestan desires "to meet with other

16   students through Common Cause at MRHS, and to share her Christian faith with her

17   classmates through Common Cause activities."  *Id*. ¶ 24.  Common Cause also holds a

18   weekly prayer meeting at the flagpole at MRHS.  The meeting occurs on Friday mornings,

19   before school, and consists of collective student prayer.  *Id*. ¶ 25.

20

21        [2] Defense counsel proposed at the beginning of the preliminary injunction hearing that
     the Court hear testimony and receive additional exhibits.  Because Defendants had not
22   notified the Court or Plaintiff's counsel of their desire to present evidence beyond the
     affidavits and documents attached to Defendants' response to the motion for preliminary
23   injunction (Dkt. #19), Plaintiff's counsel were not prepared to address this proposed new
     evidence.  To avoid further delay in resolving the motion for preliminary injunction, the
24   Court directed Defendants' counsel to make a detailed proffer concerning the evidence that
     would be submitted.  The Court then asked Plaintiff's counsel to identify the portions of the
25   proffer to which Plaintiff did not object.  The Court concludes that the verified complaint,
     affidavits, and exhibits submitted with the briefing material, together with the proffers to
26   which Plaintiff did not object, provide a sufficient factual basis for the Court to rule on
27   Plaintiff's request for a preliminary injunction.
28

1

**B.    Defendants and Their Policies.**

2    MRHS is a public high school of approximately 2,500 students. Dkt. #19, Ex. 1, ¶ 2.

3  MRHS is part of the Deer Valley Unified School District, No. 97 (the "District"). Defendant

4  Debra Poulson is the principal at MRHS. Defendant Virginia McElyea is superintendent of

5  the District. Dkt. #7, ¶ 37.

6    The District's Administrative Management Guide states that students have the right

7  to pray individually or in groups, audibly or silently, and to discuss religious views with

8  peers as long as they are not disruptive of other students or staff. Dkt. #19, Ex. 1, ¶ 3. The

9  Guide also states that students may participate in religious events both before and after

10  school, including prayer at the flagpole. Dkt. #19 at 29. The District's equal access policy

11  provides that "student religious clubs must be permitted to meet during non-instructional

12  times and have equal access to campus media to announce meetings if the same is accorded

13  for student non-curricular clubs." *Id*. The Guide further provides that "[t]he distribution of

14  religious literature to and among students is subject to reasonable time, place, and manner

15  or other constitutionally acceptable restrictions imposed on distribution of non-school

16  literature." *Id*. Students are permitted to wear religious attire. *Id*. at 91.

17    Morning announcements are made each day to the entire MRHS student body. The

18  announcements are made over a public address system which includes a video feed (the "PA

19  system"). Announcements occur during the second hour of the school day. All students are

20  required to be in attendance during the announcements.

21    Any student club may submit a request for an announcement. The request is to be

22  made on a printed form obtained from the activities office and returned to the office by noon

23  on the day before the announcement is to be made. Dkt. #19 at 68. Morning announcements,

24  including approved student club announcements, are read over the PA system by a member

25  of the school's administration or student leadership. If the announcement includes a video

26  presentation, the video is shown to the entire student body during the announcement.

27    Printed materials may be distributed on campus only after approval from the

28  administration. The MRHS Parent/Student Handbook provides that "[a]pproval must be

1   obtained from the administration at least two days prior to distribution.  A student denied

2   approval may have the right to appeal to the principal as part of due process." *Id.* at 34.  In

3   addition to the requirement of prior approval, written materials may be distributed by

4   students only during the lunch hours of two days in the Fall known as "club rush," when

5   student clubs solicit members, and during student elections held during one week in the Fall

6   and two weeks in the Spring.  Leaflets may be distributed during the election weeks before,

7   during, or after school.  Defendants limit the distribution of leaflets to the 17 days of club

8   rush and elections in order to control litter on the MRHS campus. Dkt. #19, ¶ 9. Defendants

9   asserted by proffer, and Plaintiff did not dispute, that leaflets distributed during the election

10  weeks need not be limited to election-related materials.

11          The District and MRHS grant official club status to noncurriculum student clubs.

12  Dkt. #7, ¶ 55.  These clubs may meet on the school premises during non-instructional time.

13  *Id.*, ¶ 56.  Noncurriculum clubs currently recognized by the District include, among others,

14  Teen Republicans; Young Democrats of America; Family, Career and Community Leaders

15  of America; Anime Club; Chess/Gamers Club; Gay-Straight Alliance; Interact Club; Youth

16  Alive; International Club; Best Buddies; Trap Door Society; Students Against Drunk

17  Driving; and Common Cause.  *Id.*, ¶ 57.

18          **C.      The Events at Issue in this Case.**

19                  **1.      Plaintiff's Proposed Video.**

20          In January of 2008, Plaintiff submitted a video to Defendants to be played during the

21  MRHS morning announcements.  The video, which was created by Common Cause, seeks

22  to encourage students to participate in Common Cause's weekly prayer at the flagpole.  The

23  video consists of numerous photographs of students participating in the weekly prayer

24  activity, including photographs of students holding hands and bowing their heads.  The audio

25  portion of the video consists of music played by a Christian rock band with Christian-themed

26  lyrics.[3]  While the music plays and the photographs of students are displayed in rapid

27  _____

28          [3] The lyrics of the song are as follows: "If weakness is a wound that no one wants to
    speak of, then cool is just how far we have to fall; I am not immune – I only wanna be loved,

- 4 -

1  succession, the following words appear on the video screen, superimposed over the
2  photographs: "Our Motto Is . . . Don't Worry About Anything; Instead, PRAY ABOUT
3  EVERYTHING!  Common Cause Presents . . . We Pray . . . Together; Encouragingly;
4  Hopefully; Upliftingly; COME JOIN Common Cause 7:20 am Friday Mornings, at the Flag
5  Pole Outside the Administrative Office."   Dkt. #7, ¶ 72.   The words "Common Cause
6  Presents" are shown in white lettering on a black screen with a small symbol of a cross.

7       Although the parties differ in their factual descriptions of what occurred after Krestan
8  submitted the video for morning announcements, it is undisputed that Defendants declined
9  to show the videotape.   Defendants contend that doing so would have violated the
10 Establishment Clause of the First Amendment to the United States Constitution.   Plaintiff
11 contends that non-religious student clubs are permitted to show similar promotional videos
12 over the school's PA system, and that Common Cause therefore has a statutory and
13 constitutional right to do the same.

14                    **2.        Plaintiff's Proposed Leaflet.**

15      Plaintiff sought to distribute a leaflet inviting students to participate in the weekly
16 prayer at the flagpole.  The leaflet included the words "Prayer at the Pole!!!" and said "Come
17 join Common Cause Friday, February 15th at 7:20 a.m. at the administration flagpole for
18 prayer and fellowship!"  Dkt. #7-2 at 25.  Beneath these words appeared a cross.

19      Plaintiff contends that Principal Poulson initially stated that the leaflet could not be
20 distributed because it contained a religious symbol, and then stated that no students were
21 allowed to distribute leaflets during the school day. Dkt. #7, ¶¶ 88-89.  Defendants deny
22 these allegations and assert that distribution of the leaflet was prevented on the basis of
23 MRHS's policy of allowing leaflet distribution only during club rush and election weeks.
24 Dkt. #19 at 23-24.  Defendants stated at the preliminary injunction hearing that the content
25 of the leaflet is not objectionable and that Plaintiff would be permitted to distribute the leaflet
26 during the approved days for student distribution of literature.   Plaintiff contends that

27 _____

28 but I feel safe behind the firewall.  I'm not alright, I'm broken inside, broken inside; And all
   I go through, it leads me to you, it leads me to you.  Burn away the pride[.]" Dkt. #8, Ex. B.

1   Defendants' leaflet distribution policy violates her First Amendment rights because it limits

2   distribution to only 17 days of the school year and vests unlimited discretion in school

3   administration to decline leaflets submitted for approval by students.[4]

4                       **3.      Plaintiff's Proposed Announcements.**

5           Two additional proposed announcements have been raised in Plaintiff's motion.

6   Plaintiff submitted the following proposed announcement to be read over the school's PA

7   system: "Common Cause will be having weekly prayer every Friday morning at 7:20 at the

8   administration flag pole, come join us!"  Dkt. 7-2 at 21.   Defendants permitted this

9   announcement to be read on February 8, 2008.  Dkt. ##7, ¶ 101; 18, ¶ 82.   Plaintiff

10  nonetheless asks the Court to require Defendants to continue permitting this announcement,

11  noting that Defendants could decide to exclude the announcement at any time.

12          Plaintiff's second proposed announcement read as follows: "There will be a Common

13  Cause meeting this week in A185.  We will be discussing pride and character in Psalms and

14  Matthew.  Make sure you bring your Bibles!  See you there!"  Dkt. #7-2 at 23.  Again, the

15  parties disagree on the facts that followed the proposal of this announcement.  Defendants

16  now assert, however, that reading the announcement over the school's PA system would

17  constitute an improper establishment of religion.  Plaintiff disagrees, and asks the Court to

18  require by injunction that the announcement be read.

19  **II.     Standards for Preliminary Injunctive Relief.**

20          To prevail on her motion for a preliminary injunction, Plaintiff "must demonstrate

21  either (a) probable success on the merits combined with the possibility of irreparable injury

22

23  _____

24          [4] In an affidavit attached to her reply memorandum, Plaintiff asserts that she attempted
    to distribute a leaflet during club rush in the Fall of 2007. Dkt. #20-2 at 6. Plaintiff states
25  that the Common Cause faculty sponsor told her that she could not distribute the flyer
    because it contained a cross, a Christian fish symbol, and the word "prayer." *Id*. at 4. The
26  Court will not consider this alleged incident because it is not contained in the complaint filed
    before the preliminary injunction hearing (Dkt. #7) or the materials submitted with the
27  motion for preliminary injunction (Dkt. #19).  Issues should not be raised for the first time
    in reply memoranda. *Cf. Cuevas-Gaspar v. Gonzales*, 430 F.3d 1013, 1021 n.4 (9th Cir.
28  2005) (issues not raised in opening materials are deemed waived).

1    or (b) that [she] has raised serious questions going to the merits, and that the balance of

2    hardships tips sharply in [her] favor." *Bernhardt v. L.A. County*, 339 F.3d 920, 925 (9th Cir.

3    2003).  The Ninth Circuit has explained that "these two alternatives represent extremes of

4    a single continuum, rather than two separate tests.  Thus, the greater the relative hardship to

5    the moving party, the less probability of success must be shown." *Immigrant Assistant*

6    *Project of L.A. County Fed'n of Labor (AFLCIO) v. INS*, 306 F.3d 842, 873 (9th Cir. 2002).

7            The Court can dispose of the irreparable injury inquiry quite easily.  "The loss of First

8    Amendment freedoms, for even minimal periods of time, unquestionably constitutes

9    irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976).  In the Ninth Circuit, "a

10   party seeking preliminary injunctive relief in a First Amendment context can establish

11   irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a

12   colorable First Amendment claim." *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959,

13   973 (9th Cir. 2002).  Because the possibility of irreparable harm is clear in this First

14   Amendment case, the Court must grant preliminary injunctive relief if Plaintiff has

15   established a probability of success on the merits.

16   **III.    Plaintiff's Video.**

17           Plaintiff claims that the Equal Access Act and the First Amendment require

18   Defendants to broadcast her proposed video over the school's PA system.  Because the Court

19   concludes that Plaintiff has established a probability of success on the merits of her Equal

20   Access Act claim, it need not address her First Amendment Claim.  *See Prince v. Jacoby*, 303

21   F.3d 1074, 1077 (9th Cir. 2002) (court considers claims first under the Equal Access Act and

22   then, if necessary, under the First Amendment).[5]

23

24

25

26           [5] Many First Amendment cases brought against school officials address issues of
     qualified immunity. *See, e.g.*, *Lassonde v. Pleasanton Unified Sch. Dist.*, 320 F.3d 979, 982-
27   83 (9th Cir. 2003); *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1100 (9th
     Cir.2000).  Defendants have not raised such issues in response to the motion for preliminary
28   injunction.

1

**A.      The Act and Its Purpose.**

2

The Equal Access Act provides:

3

It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of their religious, political, philosophical, or other content of the speech at such meetings.

4

5

6

7

20 U.S.C. § 4071(b).  The Act further provides that "[a] public secondary school has a

8

limited open forum whenever such school grants an offering to or opportunity for one or

9

more noncurriculum related student groups to meet on school premises during

10

noninstructional time."  20 U.S.C. § 4071(b).

11

Although the text of the statute refers to meetings, courts have made clear that the Act

12

extends to all opportunities afforded noncurriculum student clubs.  The Ninth Circuit has

13

explained that the Act "guarantees public secondary school students the right to participate

14

voluntarily in extracurricular groups dedicated to religious, political, or philosophical

15

expressive activity protected by the First Amendment when other student groups are given

16

this right."  *Prince*, 303 F.3d at 1078.  By guaranteeing "equal access," the Act dictates that

17

"religiously-oriented student activities must be allowed under the same terms and conditions

18

as other extra-curricular activities, once the secondary school has established a limited open

19

forum."  *Id*. at 1081.  The Supreme Court has explained that by placing religious student

20

clubs on equal footing with similar non-religious student organizations the Act "allows

21

student clubs to be part of the student activities program and carries with it access to the

22

school newspaper, bulletin boards, the public address system, and the annual Club Fair."  *Bd.*

23

*of Ed. of the W. Side Cmty. Sch. v. Mergens*, 496 U.S. 226, 247 (1990).  The Act "was passed

24

by wide, bipartisan majorities in both the House and the Senate," "was intended to address

25

perceived widespread discrimination against religious speech in public schools," and should

26

be given a "broad reading."  *Mergens*, 496 U.S. at 238-39; *see Prince*, 303 F.3d at 1083.

27

It also is clear, however, that the Establishment Clause limits the ability of public

28

schools to promote student religious activities.  "For example, if a public school required

1    student participation in or itself participated in or sponsored religious meetings on the high

2    school campus, it would bump squarely into Establishment Clause jurisprudence prohibiting

3    such government sponsorship of religion." *Prince*, 303 F.3d at 1082.  Indeed, the Act itself

4    recognizes Establishment Clause limitations.  The Act is not to be read to enable a school to

5    influence the form or content of any prayer or religious activity, to require any person to

6    participate in prayer or religious activity, to expend public funds beyond the incidental cost

7    of providing space for student-initiated meetings, to compel any school employee to attend

8    a school meeting contrary to the beliefs of that employee, or to abridge the constitutional

9    rights of any person.  20 U.S.C. § 4071(d).  Thus, if broadcast of Plaintiff's proposed video

10   would violate the Establishment Clause and thereby violate the First Amendment rights of

11   other students at MRHS, the Act does not require that Defendants broadcast the video.

12          **B.     Is the Equal Access Act Triggered in this Case?**

13          Three elements must be satisfied for the Act to apply.  MRHS must be (1) a public

14   secondary school (2) that receives federal funding and (3) has established a "limited open

15   forum" by allowing noncurriculum student groups to meet on school premises and advertise

16   their activities in school announcements or publications.  *Prince*, 303 F.3d at 1079; *see*

17   *Mergens*, 496 U.S. at 247.  All three elements are satisfied here.  MRHS is a public high

18   school, it receives federal funds, and it allows noncurriculum student clubs to present video

19   announcements over the school's PA system during morning announcements.

20          The video announcements allowed by MRHS are not limited to mere factual

21   recitations. Defendants permit student clubs to present videos that openly encourage students

22   to participate in their clubs.  For example, Plaintiff has submitted to the Court a video

23   announcement by the Young Democrats of America ("YDA") that Defendants allowed to be

24   broadcast during morning announcements.  The video states that the club enables students

25   to discuss controversial issues, learn about the political views of both major parties, and

26   volunteer support for Democratic presidential candidates.  It shows photographs of major

27   Democratic candidates and states that 58% of young voters are Democrats.  It tells students

28   that they "should consider joining the YDA club" and shows a picture of Uncle Sam,

1   pointing his finger at the viewer, with the words "YDA Wants You." The video closes by

2   stating that it is "not too late to join."

3        Plaintiff's Common Cause video is similarly promotional. It shows photographs of

4   the club's weekly prayer meeting, explains that it is a forum for students to pray about

5   problems in a hopeful and encouraging environment, and includes the words "come join us."

6   The purpose of the video is to promote student participation in the Common Cause weekly

7   prayer at the flagpole.

8        Under the Equal Access Act, "religiously-oriented student activities must be allowed

9   under the same terms and conditions as other extra-curricular activities, once the secondary

10  school has established a limited forum." *Prince,* 303 F.3d at 1082. Because MRHS has

11  clearly established a limited open forum in which student clubs can promote themselves by

12  video, the Act requires that MRHS afford Common Cause the same right unless doing so

13  would violate the Establishment Clause.

14       **C.    Establishment Clause.**

15       The analytical test to be applied in determining whether the video violates the

16  Establishment Clause is not easily identified. *See Card v. City of Everett*, 520 F.3d 1009,

17  1013-16 (9th Cir. 2008) (discussing the somewhat confused state of Establishment Clause

18  jurisprudence). The Supreme Court has used a number of different tests. In the plurality

19  portion of her opinion for the Supreme Court in *Mergens*, Justice O'Connor applied the

20  traditional three-part test found in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). *See Mergens*,

21  496 U.S. at 247-53. That test asks (1) whether the government action in question has a

22  secular purpose, (2) whether its principal or primary effect is one that neither advances nor

23  inhibits religion, and (3) whether the action would foster an excessive government

24  entanglement with religion. *Lemon*, 403 U.S. at 612-13.

25       Justice Kennedy concurred with the *Mergens* plurality, but applied a different test.

26  *Mergens*, 496 U.S. at 260-62. He asked whether the government action gives direct benefits

27  to a religion in such a degree that it in fact establishes a state religion, or whether the

28  government action coerces any student to participate in a religious activity. *Id.* at 260.

The Supreme Court's decision in *Good News Club v. Milford Central School*, 533 U.S. 98 (2001), which was handed down after *Mergens*, applied neither *Lemon* nor Justice Kennedy's test. The case instead considered the school's neutrality toward religion, any coercive pressure students might feel to engage in the club's activity, and whether the school's action would be perceived as an endorsement of particular religious views. *Id*. at 114-18. Because *Good News Club* is a more recent statement of the analysis to be applied in a school Establishment Clause case, this Court will consider the factors it identifies. The Court will also take into account factors addressed by Justices O'Connor and Kennedy in *Mergens*.

### 1. Neutrality.

"'[A] significant factor in upholding governmental programs in the face of Establishment Clause attack is their *neutrality* towards religion.'" *Good News Club*, 533 U.S. at 114 (emphasis in original) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 839 (1995)). The Supreme Court has observed that "the 'guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse.'" *Id.* (quoting *Rosenberger*, 515 U.S. at 839).

In *Prince*, the Ninth Circuit upheld the right of a student Bible club to have access to fundraising events, the school yearbook, and "facilities to publicize their events, including the right to post flyers throughout the school, rather than on a single bulletin board, and the use of the public address system." 303 F.3d at 1078. In addressing Establishment Clause concerns, the Ninth Circuit explained that students in the Bible club "seek nothing more than to be treated neutrally and to be given access to speak about the same topics as other groups. There is no question that requiring that the School District grant religious groups access to the [student club] forum would *ensure* neutrality." *Id*. at 1092 (emphasis in original).

The same is true here. MRHS recognizes a broad range of student clubs. All of them have access to the school's PA system for promoting their clubs and activities. Granting a

1   similar right to Common Cause would not constitute favoritism of religion, but instead would

2   represent neutral treatment of all clubs, whether religious or non-religious. As in *Prince*,

3   permitting Common Cause to broadcast a promotional video will ensure neutrality, not

4   offend it.

5                   **2.      Coercion.**

6          Courts have found that prayer or proselytizing activities can have a coercive effect on

7   high school students in certain situations. For example, in *Cole v. Oroville Union High*

8   *School District*, 228 F.3d 1092, 1100 (9th Cir. 2000), the Ninth Circuit found that permitting

9   a student to offer a sectarian prayer at the beginning of a high school graduation ceremony,

10  and permitting another student to give a clearly proselytizing speech during the same

11  graduation ceremony, would have a coercive effect on students and others in attendance. As

12  the Court of Appeals explained, some students would be required either to forego attendance

13  at the once-in-a-lifetime event of their graduation, or silently participate in religious activity

14  with which they disagreed – sectarian prayer and proselytizing. *Id.* at 1104. "Thus, allowing

15  [the student's clearly religious] speech at graduation would have compelled a dissenter's

16  implicit participation in the proselytizing." *Id.*; *see Lassonde v. Pleasanton Unified Sch.*

17  *Dist.*, 320 F.3d 979, 982-83 (9th Cir. 2003) (religious speech at high school graduation

18  violated Establishment Clause).

19         Plaintiff's proposed video does not present a similar risk of coerced participation in

20  prayer or proselytizing. The video is not a prayer. Although it describes a weekly prayer

21  event to which students are invited, it does not itself contain an intended communication with

22  the Divine. An objective observer watching the video would not feel that he or she was

23  unwillingly being required to participate in a prayer. Nor does the video constitute

24  proselytizing in the traditional religious sense. True, it promotes involvement in Common

25  Cause club events, just as other student club videos promote involvement in their events, but

26  it does not exhort the listener to convert to a particular religious point of view.[6]

27  _____

28         [6]Defendants might contend that the lyrics of the background song can be interpreted
    as a prayer. *See* footnote 3, *supra.* The predominant message from the background music,

1    A helpful comparison can be made to cases which have found coercion.  In *Cole*, for

2    example, a student sought to proselytize in a speech at a high school graduation:

3        Niemeyer's proposed speech was a religious sermon which advised the
         audience that "we are all God's children, through Jesus Christ [sic] death when
4        we accept his free love and saving grace in our lives," and requested that the
         audience accept that "God created us" and that man's plans "will not fully
5        succeed unless we pattern our lives after Jesus' example." Finally, Niemeyer's
         speech called upon the audience to "accept God's love and grace" and "yield
6        to God our lives."

7    228 F.3d at 1097.

8        The speech at the graduation ceremony in *Lassonde*, which the Ninth Circuit also

9    found coercive, was similar:

10       I urge you to seek out the Lord, and let Him guide you.  Through His power,
         you can stand tall in the face of darkness, and survive the trends of "modern
11       society."

12       As Psalm 146 says, "Do not put your trust in princes, in mortal men, who
         cannot even save themselves. . . .  The Lord sets prisoners free, the Lord gives
13       sight to the blind, the Lord lifts up those who are bowed down, the Lord loves
         the righteous. . . .
14
         For the wages of sin is death; but the gift of God is eternal life through Jesus
15       Christ our Lord."  Have you accepted the gift, or will you pay the ultimate
         price?
16

17   320 F.3d at 981.

18       Plaintiff's video does not contain similar language exhorting the viewer to accept a

19   particular religious viewpoint.  It describes Common Cause's weekly prayer meetings and

20   invites the listener to attend.

21       Nor does the Court find the morning student-club announcements to be a setting in

22   which students are likely to feel coerced or pressured.  Students at MRHS are capable of

23   understanding that the video represents the viewpoint of Common Cause, not the school

24   administration.  As the plurality noted in *Mergens*:

25   _____

26   however, is rock music.  The lyrics are difficult to hear and hard to follow, and would not be
     considered by a listener to be a prayer in the same sense as the clearly sectarian prayer
27   proposed for the high school graduation in *Cole*, where the person offering the prayer at the
     commencement of a school-sponsored and school-controlled event would purport to be
28   speaking on behalf of all present.

> [T]here is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect. We think that secondary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis.

496 U.S. at 250 (plurality) (emphasis in original); *see Prince*, 303 F.3d at 1094. This Court concludes that Plaintiff's proposed videotape – which constitutes neither prayer nor proselytizing – would not be coercive in the club-announcement setting of MRHS.

### 3.    Endorsement.

For the same reason, the Court concludes that broadcast of Plaintiff's video would not amount to Defendants' endorsement of a particular religious view. As the Supreme Court observed in the excerpt from *Mergens* quoted above, secondary school students are capable of understanding the difference between private and government speech. Students at MRHS are exposed daily to student announcements over the PA system. They understand that many student clubs have been organized at the school. They regularly hear promotional communications from those clubs. Students in this setting would not be confused into thinking that the Common Cause video constitutes an official school endorsement of the weekly prayer event any more than they would be confused into thinking that YDA's video constitutes an official school endorsement of the Young Democrats of America. As the Ninth Circuit stated in *Hills v. Scottsdale Unified School District*, 329 F.3d 1044 (9th Cir. 2003), schools simply "'do not endorse everything they fail to censor.'" *Id*. at 1055 (quoting *Mergens*, 496 U.S. at 250 (plurality)).

The Ninth Circuit has provided this helpful instruction:

> We agree with the Seventh Circuit that the desirable approach is not for schools to throw up their hands because of the possible misconceptions about endorsement of religion, but that instead it is far better to teach students about the [F]irst [A]mendment, about the difference between private and public action, about why we tolerate divergent views. The school's proper response is to educate the audience rather than squelch the speaker. Schools may explain that they do not endorse speech by permitting it. If pupils do not comprehend so simple a lesson, then one wonders whether the schools can teach anything at all. Free speech, free exercise, and the ban on establishment are quite compatible when the government remains neutral and educates the public about the reasons.

1   *Hills*, 329 F.3d at 1055 (quoting *Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 992

2   F.3d 1295, 1299-1300 (7th Cir. 1993)) (quotation marks and brackets omitted).

3      In support of their argument that students may conclude that the school administration

4   endorses Plaintiff's video, Defendants assert that they received several parent and student

5   complaints in October of 2007 when a similar video was broadcast over the school's PA

6   system without administration approval.  There are two reasons the Court finds this fact

7   unavailing.  First, as noted above, such an incident merely emphasizes the importance of

8   educating students about the difference between private and governmental speech and about

9   the importance of neutrality toward all forms of private speech.  Second, case law makes

10  clear that the risk of perceived endorsement is to be judged on the basis of "an objective

11  observer," not any individual or group.  *Mergens*, 496 U.S. at 249 (plurality); *Cole*, 228 F.3d

12  at 1103.  The Court agrees with the Supreme Court and Ninth Circuit that an objectively

13  reasonable high school student will understand the difference between private and school-

14  endorsed speech.  *See Mergens*, 496 U.S. at 250 (plurality); *Prince*, 303 F.3d at 1094.

15    **D.**  **Conclusion.**

16     The Court concludes that Plaintiff is likely to prevail on the merits of her claim that

17  display of the Common Cause video is required by the Equal Access Act.  The Act has been

18  triggered, Common Cause has been denied an opportunity to advertise its activities on the

19  same terms and conditions as other clubs, and Defendants' actions are not justified by the

20  Establishment Clause.  The Court therefore will enter a preliminary injunction requiring that

21  Defendants permit Plaintiff to broadcast the video.[7]

22  / / /

23  / / /

24  _____

25     [7]Even if the Court were to apply the three-part test of *Lemon*, it would find no

26  Establishment Cause problem.  The Court concludes that (1) broadcasting the Common Cause video during student club announcements would have the secular purpose of equal access to all student clubs, (2) would therefore not have a principal or primary effect of

27  advancing or inhibiting religion, and (3) would not foster an excessive government

28  entanglement with religion.  *Lemon*, 403 U.S. at 612-13.

1    **IV.    Plaintiff's Leaflet.**

2          Plaintiff argues that Defendants impermissibly prevented Common Cause from

3    distributing a leaflet which contained the word "prayer," contained a symbol of a cross, and

4    invited students to the weekly prayer meeting at the flagpole.  *See* Dkt. #7; Dkt. #7-2 at 25.

5    At the preliminary injunction hearing, Defendants stated that a leaflet with this religious

6    content would be approved for distribution, but that distribution would be restricted to the

7    17-day club rush and election time periods when student leaflets are allowed.  Plaintiff

8    maintains that this limited time frame and MRHS's procedures for pre-approving student

9    flyers violate her First Amendment rights.  Plaintiff does not claim that other student clubs

10   have been permitted to distribute leaflets, and therefore does not make this claim under the

11   Equal Access Act.

12         **A.    Time Restriction.**

13         "When the State establishes a limited public forum, the State is not required to and

14   does not allow persons to engage in every type of speech."  *Good News Club*, 533 U.S. at

15   106.  Restrictions on speech in limited public fora "are permissible if they are viewpoint

16   neutral and reasonable in light of the purpose served by the forum."  *Hills*, 329 F.3d at 1049

17   (citations omitted); *see Good News Club*, 533 U.S. at 106-07 (speech restrictions in a limited

18   public forum "must not discriminate against speech on the basis of viewpoint" and "must be

19   reasonable in light of the purpose served by the forum") (internal quotes and citations

20   omitted).

21         Despite agreeing that MRHS has created a limited public forum, Plaintiff asserts that

22   student distribution of literature at MRHS is not governed by *Good News Club* and *Hills*, but

23   instead falls under *Tinker v. Des Moines Independent Community School District*, 393 U.S.

24   503, 506 (1969).[8]  The Court does not agree.  In *Morse v. Frederick*, 127 S. Ct. 2618 (2007),

25

26         [8]*Tinker* held that a school's suppression of student speech – the wearing of black

27   armbands to protest the Vietnam War – violated the First Amendment.  While school
     officials can curb student speech that is deemed to "materially and substantially disrupt the

28   work and discipline of the school," 393 U.S. at 513, the arm bands were merely "silent,
     passive expression of opinion, unaccompanied by any disorder or disturbance," *id*. at 508.

1   which upheld the right of school administrators to confiscate a pro-drug banner and suspend
2   the student responsible for it, the Supreme Court expressly rejected the notion that *Tinker*
3   categorically applies to all student free speech, explaining that "the mode of analysis set forth
4   in *Tinker* is not absolute" and that the Supreme Court has not uniformly invoked *Tinker's*
5   "substantial disruption" analysis when resolving First Amendment student speech claims.
6   *Id*. at 2627.

7       The parties also address whether the leaflet restrictions in this case are reasonable
8   "time, place, and manner" limitations. *See* Dkt. ##19, 20. Speech otherwise protected by the
9   First Amendment may be subject to time, place, and manner restrictions "provided that they
10  are justified without reference to the content of the regulated speech, that they are narrowly
11  tailored to serve a significant governmental interest, and that they leave open ample
12  alternative channels for communication of the information." *Clark v. Cmty. for Creative*
13  *Non-Violence*, 468 U.S. 288, 293 (1984). The courts in *Good News Club* and *Hills*, however,
14  did not engage in time, place, and manner analysis, but instead applied the content-neutral
15  and reasonableness standard discussed above. *See also Truth v. Kent Sch. Dist.*, --- F.3d ----,
16  No. 04-35876, 2008 WL 1836739, at *13-14 (9th Cir. Apr. 25, 2008). This Court will do the
17  same. Because MRHS has established a limited public forum, limitations on speech within
18  that forum are permissible if they are content-neutral and reasonable in light of the purpose
19  of the forum.

20      Defendants' policy restricting the distribution of leaflets to 17 days each year is
21  content neutral. It applies to all student-created literature.

22      The more difficult question is whether the restriction is reasonable in light of the
23  purpose served by the forum. Principal Poulson stated in her affidavit that "we do not allow
24  students to distribute printed material generally on campus [because] we have had problems
25  with litter in the past, and administrative staff and time are used to pick up the litter."
26  Dkt. #19, Ex. 1 ¶ 9.

27      Plaintiff argues that littering concerns do not provide a reasonable basis for restricting
28  the distribution of leaflets, citing *Schneider v. New Jersey*, 308 U.S. 147 (1939). In

1    *Schneider*, the Supreme Court held that "the purpose to keep the streets clean and of good

2    appearance is insufficient to justify an ordinance which prohibits a person rightfully on a

3    public street from handing literature to one willing to receive it." *Id*. at 162. *Schneider*

4    explained that the government retains the "power to prevent street littering" by punishing

5    "those who actually throw papers on the streets." *Id*.

6         *Schneider* did not concern a public high school campus, and in the realm of

7    permissible speech restrictions, context matters. The Supreme Court has explained that "the

8    existence of a right of access to public property and the standard by which limitations upon

9    such a right must be evaluated differ depending on the character of the property at issue."

10   *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983); *see Bethel Sch.*

11   *Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986); *Tinker,* 393 U.S. at 506. Public secondary

12   schools are "not open for indiscriminate use by part or all of the general public." *Hills*, 329

13   F.3d at 1049. They are controlled environments, tailored to the education and learning of

14   students. The Court therefore finds *Schneider* to be of limited probative value.

15        The Supreme Court more recently has suggested that concerns regarding appearance

16   and aesthetics may serve as substantial governmental interests when speech is curtailed. *See*

17   *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 817 (1984)

18   (a city's "esthetic interests," among others, are "sufficiently substantial to justify [a]

19   content-neutral" ban on public signs); *see also Metromedia, Inc. v. San Diego*, 453 U.S. 490

20   (1981) (furthering the appearance of the city is a substantial governmental interest). Such

21   concerns are even more relevant in the context of public schools, where order is required if

22   education is to proceed. *See Fraser*, 478 U.S. 683 ("The process of educating our youth for

23   citizenship in public schools is not confined to books, the curriculum, and the civics class;

24   schools must teach by example the shared values of a civilized social order.").

25        The Court need not decide how far a school can go in suppressing speech in the name

26   of maintaining order. Clearly there are limits, as *Tinker* and other cases teach. The only

27   question to be decided in this case is whether Defendants' policy of limiting leaflets to 17

28   school days each year is "reasonable in light of the purpose served by the forum" – educating

high school students.  *Good News Club*, 533 U.S. at 106-07.  The Court concludes that it is.
Defendants are charged with operating and maintaining a campus that hosts 2,500 students
every school day.  Order and appearance are no doubt important to MRHS's educational
purpose.  Devoting human and financial resources to the work of educating – rather than the
work of cleaning – is key to that purpose.  Given the purpose served by the limited public
forum of the MRHS campus, the Court concludes that it is reasonable for Defendant to place
restrictions on the number of days during which students can distribute leaflets.  At least one
other federal court has agreed.  *See Nelson v. Moline Sch. Dist. No. 40*, 725 F. Supp. 965
(C.D. Ill. 1989) (aesthetic and economic issues related to littering were an adequate
justification for restrictions on student speech).

Because the Court finds that Defendants' leaflet policy is both content-neutral and
reasonable in light of the purpose served by the forum, Plaintiff is not likely to prevail on her
claim that the policy violates her First Amendment rights.  *See Good News Club*, 533 U.S.
at 106-07; *Hills*, 329 F.3d at 1049.  The Court will not grant preliminary injunctive relief on
this issue.[9]

**B.    Pre-Approval Procedures.**

The parties agree that MRHS has a policy requiring advance approval of student
leaflets prior to distribution, even during the club rush and election weeks.  *See* Dkt. #8 at 15-
17; Dkt. #19, Ex. 1 ¶¶ 8, 23.  "Approval must be obtained from the administration at least
two days prior to distribution."   *See* Dkt. #7, Ex. F.

Plaintiff objects to the policy on the grounds that it is without substantive standards

---

[9]A plaintiff who fails to show a probability of success on the merits can nonetheless
obtain injunctive relief if she raises substantial questions and the balance of hardships tips
sharply in her favor.  *Bernhardt*, 339 F.3d at 925.  The Court does not conclude, however,
that the balance of hardships tips sharply in Plaintiff's favor on the leaflet issue.  Given the
announcements of the Common Cause activities currently being made by Defendants and
those that will be required as a result of this order, the Court cannot say that Plaintiff's
inability to distribute leaflets on campus would impose a substantially greater burden on her
than the burden that would be imposed on Defendants by enjoining enforcement of their 17-
day leaflet distribution policy.

1   or procedural safeguards.  *See* Dkt. #8 at 15-17.  Plaintiff claims that she was not permitted

2   to distribute the Common Cause leaflet because it displayed a cross.  Defendants dispute this

3   assertion.  They contend that Plaintiff was prevented from distributing her leaflet because of

4   the 17-day distribution policy, not because of the leaflet's content.  As noted above,

5   Defendants stated at the preliminary injunction hearing that the content of Plaintiff's leaflet

6   is unobjectionable and that distribution of the leaflet may occur during the 17 days of club

7   rush and elections.

8          The Court concludes that Plaintiff has not shown a risk of imminent injury due to

9   Defendants' pre-approval policy.  Although the deprivation of First Amendment rights

10  clearly can constitute irreparable harm, Plaintiff has not shown that Defendants' pre-approval

11  policy is depriving her of the right to distribute the leaflet.  The Court concludes, therefore,

12  that Plaintiff is not entitled to preliminary injunctive relief on this issue.[10]

13  **V.     Additional Announcements.**

14         **A.     Announcement of Weekly Prayer Meeting.**

15         Plaintiff submitted the following announcement to be read over the morning PA

16  system:  "Common Cause will be having weekly prayer every Friday morning at 7:20 a.m.

17  at the administration flag pole, come join us!"  Dkt. #7-2, Ex. F.  Defendants read this

18  announcement to the MRHS student body on February 8, 2008.  Defendants have asserted

19  in their papers and during the preliminary injunction hearing that the announcement is

20  unobjectionable.  Given these facts, the Court concludes that preliminary injunctive relief is

21  not required.  The conduct to be enjoined – denial of this announcement – is not occurring,

22  and Plaintiff has presented no evidence that it is likely to occur in the future.

23         **B.     Announcement of Bible Study.**

24         Defendants declined to read the following announcement:  "There will be a [C]ommon

25  [C]ause meeting this week in A-185.  We will be discussing pride and character in Psalms

26  and Matthew.  Make sure you bring your bibles!  See you there!"  Dkt. #7-2, Ex. G.  The

27  
────────────────
28         [10]This ruling does not preclude Plaintiff from attempting to show at trial that
     Defendants' pre-approval policy is in fact depriving her of First Amendment rights.

1   parties disagree on whether Defendants denied the announcement because it mentioned
2   books of the bible or because it instructed students to bring their bibles to the event.
3   Regardless of this disagreement, Defendants now assert that reading the announcement over
4   the PA system would violate the Establishment Clause.  Defendants base this position on the
5   announcement's direction that students bring their bibles and attend the class.

6        The Court finds this to be a somewhat closer question than Plaintiff's proposed video.
7   Unlike the video, this announcement would be read by administration officials or student
8   leaders.  It also contains a direct exhortation to "[m]ake sure you bring your bibles!"
9   Students arguably could interpret an administrator's or student leader's reading of this
10  announcement as an official endorsement of Plaintiff's religious views.   On balance,
11  however, the Court concludes that Defendants are unlikely to prevail on this Establishment
12  Clause argument and that Plaintiff therefore is likely to prevail on the merits of her claim that
13  reading of the announcement is required by the Equal Access Act.

14       **1.    Neutrality.**

15       Student announcements are read every morning at MRHS.  Announcements may be
16  submitted by any one of the many student clubs at the high school.  Announcements often
17  include encouragement for students to participate in a particular club's event.   The
18  announcements read on November 20, 2007, for example, included encouragement for
19  students to bring their photos of extreme sport activities for the yearbook, for students to
20  nominate royalty for the Winter formal dance, for students to audition for the Spring musical,
21  for students to join the International Club for an African adventure, and a statement that
22  attendance at the Society of Female Scholars meeting is "very important."  Dkt. #7-2 at
23  12-13.  By reading Plaintiff's announcement urging students to attend the Common Cause
24  meeting and bring their bibles, school officials would merely be providing the same kind of
25  encouragement afforded other student organizations.

26       **2.    Coercion and Endorsement.**

27       As noted above, high school students are capable of understanding the difference
28  between private speech shared through public announcements of club activities and official

speech on behalf of the school administration. To the extent Defendants are concerned about students' ability to make this distinction, they have the power to clarify the situation. Defendants can make clear that their reading of student announcements are not to be interpreted as official endorsement of those announcements.

Moreover, perceptions of endorsement or coercion are unlikely given the wide range of student clubs recognized at MRHS. As Justice O'Connor has explained, "[t]he broad spectrum of officially recognized student clubs at Westside, and the fact that Westside students are free to initiate and organize additional student clubs, counteract any possible message of official endorsement of or preference for religion or a particular religious belief." *Mergens* 496 U.S. at 262 (plurality; citation omitted).

The Court concludes that the reading of Plaintiff's proposed announcement would be an act of neutrality and neither coercive nor reasonably perceived as an endorsement of particular religious views. Defendants are therefore unlikely to prevail on their Establishment Clause defense, and Plaintiff is likely to prevail on the merits of her Equal Access Act claim. Because the possibility of irreparable harm has already been recognized, preliminary injunctive relief is appropriate.[11]

**IT IS ORDERED:**

1.      Plaintiff's motion for preliminary injunction (Dkt. #8) is **granted in part** and **denied in part**.

        A.      Defendants shall display the video prepared by Common Cause and submitted to the Court in this action at the same time and in the same manner as other student club promotional videos are displayed.

---

[11]Yesterday, Defendants filed a supplemental memorandum noting that the school year is almost complete and only a few days of student announcements remain. Dkt. #33. Defendants suggest, therefore, that Plaintiff no longer faces a threat of harm. *Id*. Defendants' filing admits, however, that announcements days do remain, and as noted above, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373-74.

| | | |
|---|---|---|
| 1 | B. | Defendants shall read the announcement of Common Cause's weekly |
| 2 | | meeting, substantially in the form of the announcement submitted to |
| 3 | | this Court (Dkt. #7, Ex. G), at the same time and in the same manner as |
| 4 | | other student club announcements are read. |
| 5 | C. | Defendants' limitation of leaflet distribution to 17 days each year is not |
| 6 | | enjoined. |
| 7 | D. | Plaintiff has not shown that she is entitled to injunctive relief on |
| 8 | | Defendants' pre-approval policy. |
| 9 | 2. | This preliminary injunction shall remain in effect until the trial in this matter. |
| 10 | 3. | Plaintiff shall not be required to give security pursuant to Federal Rule of Civil |
| 11 | | Procedure 65(d). |
| 12 | 4. | Defendant's Motion to Supplement Defendants' Response to Motion for |
| 13 | | Preliminary Injunction (Dkt. #33) is **granted**. |

DATED this 9th day of May, 2008.

_Daniel G. Campbell_
_____
David G. Campbell
United States District Judge